## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| ISAIAS M. S.,[1] | ) | 3:22-CV-1053 (SVN) |
| *Plaintiff*, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| KILOLO KIJAKAZI, ACTING | ) | |
| COMMISSIONER OF SOCIAL | ) | September 25, 2023 |
| SECURITY ADMINISTRATION, | | |
| *Defendant*. | | |

### RULING ON PLAINTIFF'S MOTION FOR JUDGMENT ON THE PLEADINGS AND DEFENDANT'S MOTION TO AFFIRM

Sarala V. Nagala, United States District Judge.

Plaintiff Isaias M. S. brings this action pursuant to 42 U.S.C. § 405(g) of the Social Security Act ("SSA"), for review of the decision of the Acting Commissioner of the Social Security Administration (the "Commissioner" or "Defendant") denying his claim for Social Security Disability Insurance ("SSDI") benefits and Supplemental Security Income ("SSI") benefits. ECF No. 1. This case has a long history of agency proceedings and federal court litigation, after which Plaintiff originally was found to be disabled beginning in March of 2016 but not disabled between his onset date in January of 2012 and March of 2016. Upon remand, an Administrative Law Judge ("ALJ") found that Plaintiff was indeed not disabled during that period. Plaintiff now argues that the ALJ erred in finding that mental impairments did not render Plaintiff disabled from January 19, 2012, to March 8, 2016, due to the manner in which he evaluated the medical opinion evidence and Plaintiff's subjective statements of disability.

---

[1] In order to protect the privacy interest of social security litigants while maintaining public access to judicial records, in opinions issued in cases filed pursuant to § 205(g) of the Social Security Act, 42 U.S.C. § 405(g), this Court will identify and reference any non-government party solely by first name and last initial. *See* Standing Order – Social Security Cases (D. Conn. Jan. 8, 2021).

Plaintiff has moved for judgment on the pleadings, requesting that the Court grant the benefits or, in the alternative, remand the case for a new hearing and decision.  ECF Nos. 13, 14.  Defendant has cross-moved for an order affirming the Commissioner's decision.  ECF No. 17.  For the reasons set forth below, Plaintiff's motion is DENIED and Defendant's motion is GRANTED.  The decision of the Commissioner is affirmed.

## I.    FACTUAL BACKGROUND[2]

### A.  Plaintiff's Medical History

Plaintiff is a fifty-seven-year-old man who suffers from a combination of physical and mental impairments.  In August of 2011, he began seeking mental health counseling at Soundview Throgs Neck Community Mental Health Center ("Soundview") following the death of his mother and aunt.  Pl.'s Statement of Material Fact, ECF No. 15 at 3–4 (citing Tr., ECF No. 11, at 144–49).  He was diagnosed by Dr. Hector Coll-Ruiz with major depressive order and bereavement that September.  *Id.* at 3 (citing Tr. at 148).  As of January of 2012, Plaintiff was taking medication and engaging in biweekly psychotherapy sessions.  *Id.* (citing Tr. at 90).

At some point in 2011 or 2012, Plaintiff, who had quit using drugs eight years prior, began reengaging in drug use, "snorting heroin daily about $100/day and cocaine on occasion," up until August of 2012.  *Id.* at 102.  On September 28, 2012, he visited Dr. Shwetha Iyer at Montefiore Behavioral Health Center[3] who reported Plaintiff had not used drugs since starting a treatment program the previous month and was "doing well."  *Id.*  He did not return to see Dr. Iyer until February 2014.  *Id.* at 846; *see also id.* at 108 (reestablishing care in February of 2014); *id.* at 101 (describing "no show" by Plaintiff in April of 2013).

---

[2] Because Plaintiff does not dispute the ALJ's findings with regards to his physical impairments, this section will only address Plaintiff's mental impairments.  Pl.'s Statement of Material Fact, ECF No. 15 at 2 n.4.
[3] It appears that Soundview Throgs Neck Community Mental Health Center, where Plaintiff was seen by Dr. Coll-Ruiz, became Montefiore Behavioral Health Center as of July 1, 2013.  Tr. at 146.

Plaintiff reestablished care with Soundview and Dr. Coll-Ruiz around December of 2013. *Id.* at 681–88, 847; *see also* ECF No. 15 at 4–5. Treatment notes from December 2013 show that Plaintiff recently lost his wife, but was "having good and bad days" and "utiliz[ing] coping skills of keeping busy," Tr. at 215, though he was non-compliant with his medication because they caused him involuntary leg movements, *id.* at 219. *See also id.* at 847 (discussing these records). Similarly, in February 2014, treatment notes show Plaintiff was "managing depressive symptoms" and "keeping busy." *Id.* at 211. Plaintiff's reports of depressive symptoms were somewhat mixed through the rest of 2014 and 2015. *See, e.g.*, *id.* at 226 (describing that Plaintiff was feeling "sad, depressed" after son's unexpected death in May 2014); 761 (describing in November 2014 that Plaintiff believes his medications were not working and has thought about hanging himself, but denied suicidal ideation at present); 189 (describing how Plaintiff mainly "[e]xpressed frustration regarding current living arrangements" such as how "roommate expects him to cook daily" in December 2014); *id.* at 768 (describing that Plaintiff was "not feeling that good, but is moving forward" in January 2015); *id.* at 778 (describing that Plaintiff's depression was "still the same," but that he "feels tranquil" in March 2015); *id.* at 173, 782 (describing how Plaintiff was able to "process feelings" of his father's recent death in May 2015 despite triggering of depressive symptoms); *id.* at 789 (describing that Plaintiff was "feeling 'regular'" despite his depression in July 2015); *id.* at 793 (stating Plaintiff is "cooperative and engaged" and "stable" in September 2015); *see also id.* at 848 (summarizing reports of improvement in mood during this period).

In January 2016, however, his depressive symptoms began to increase, when Plaintiff "reported crying randomly, feeling alone" during the holidays due to the deaths of his family members. *Id.* at 1636; *see also id.* at 848 (noting this change). His symptoms increased in severity on March 8, 2016, when he reported "I hear someone calling my name [at night]." *Id.* at 1648.

B.  The ALJ's First Decision

On February 27, 2014, Plaintiff applied for SSDI and SSI benefits with a disability onset date of January 19, 2012.  *Id.* at 497, 501.  After his application was denied, Plaintiff requested a hearing before an ALJ.  *Id.* at 435, 447.  After ALJ David Suna held a hearing, *id.* at 382–412, he denied Plaintiff benefits, *id.* at 15–25.  As relevant here, the ALJ found, at step three, that Plaintiff's "mental impairments, considered singly and in combination, do not meet or medically equal the criteria of listings 12.04 and 12.09."  *Id.* at 18.

Proceeding to step four, the ALJ determined Plaintiff's Residual Functioning Capacity ("RFC") to be "light work as defined in 20 CFR 404.1567(b) and 416.967(b)."  In relevant part, the ALJ found Plaintiff:

> has moderate tolerance for noise. . . . He is limited to perform simple, routine tasks. He is limited to making simple work-related decisions.  He can occasionally interact with supervisors, co-workers, and the public.  He can occasionally deal with changes in Work Setting.  In addition to normal breaks, he must be allowed to be off task 10 percent of time in an 8-hour workday.

*Id.*  Last, at step five, the ALJ concluded that this RFC in combination with Plaintiff's age, education, and work experience meant "there are jobs that exist in significant numbers in the national economy that [Plaintiff] can perform."  *Id.* at 23.  Therefore, Plaintiff did not qualify as disabled from January 19, 2012, to May 20, 2016, the date of the decision.  *Id.*

C.  The ALJ's Second Decision on Remand from District Court

Following denial of review by the appeals council, Plaintiff filed a civil action in the Southern District of New York, where he resided at the time, seeking reversal of the

Commissioner's decision. *Id.* at 974. The parties stipulated to remanding the case for further administrative proceedings, which the court so ordered on August 16, 2018. *Id.* at 979–82.[4]

On remand, the appeals council of the Social Security Administration issued an order directing the ALJ to consider "new and material evidence," namely "a [September 28, 2016] mental impairment questionnaire from Dr. Hector Coll-Ruiz, a treating source, who indicated treating the claimant every two months since August 2011." *Id.* at 989. Specifically, in that September 2016 opinion, "Dr. Coll-Ruiz found that the claimant would likely be absent from work more than three days per month and assessed marked limitations in multiple functional areas such as understanding and memory, concentration and persistence, social interaction, and adaptation." *Id.* Therefore, this opinion may have supported a more restrictive RFC determination at step four.

After a second hearing on March 6, 2019, and then a supplemental hearing on September 9, 2019, the same ALJ issued a partially favorable decision on November 8, 2019: instead of finding that Plaintiff was not disabled at any time after the alleged onset date of January 19, 2012, he found that Plaintiff was disabled beginning on March 8, 2016. As for the ALJ's re-application of the five-step framework, steps one and two remained largely unchanged. *Id.* at 1002. But the ALJ diverged from his earlier decision at step three.

The ALJ first found that "prior to March 8, 2016, the date the [Plaintiff] became disabled, [Plaintiff] did not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments." *Id.* at 1003. He did not provide a specific basis for this "March 8, 2016" cut off; rather, he generally referred to "treatment records" from this period which "routinely reflect that medication was effective in improving [Plaintiff's]

---

[4] Plaintiff represents that "the court reversed the decision of the Commissioner and remanded the claim for further administrative proceedings consistent with a stipulation of the parties," ECF No. 15 at 2, but the decision was not reversed, only remanded, *see* Tr. at 979.

psychiatric symptoms" and "consultative examination findings, which reflect that [Plaintiff] presented as cooperative with intact social skills," despite Plaintiff's hearing testimony describing more severe symptoms during this time. *Id.* at 1003–04.

Proceeding to step four, the ALJ then found that "prior to March 8, 2016 [Plaintiff] had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b)," and in relevant part "was limited to simple routine tasks; tolerating no more than occasional changes in work setting; and no more than occasional interaction with supervisors, co-workers, or the public." *Id.* at 1004. In so concluding, the ALJ similarly referred to treatment records and examination findings showing improved mood when taking medication, *id.* at 1006, but also went into more detail about the medical opinion evidence, *id.* at 1007. Of note, he discussed two February 2016 opinions by Dr. Mahony, a state consultative psychiatric examiner, and Dr. Meisel, a state consultative orthopedic examiner. *Id.* He did not, however, discuss the September 2016 Dr. Coll-Ruiz opinion he was directed to consider on remand. *See id.* On the whole, the RFC determination was largely consistent with that in the ALJ's earlier decision, and lead to a determination at step five that there were a significant number of jobs in the national economy Plaintiff could perform. *Id.* at 1008. Therefore, the ALJ found Plaintiff was not disabled prior to March 8, 2016.

Next, the ALJ returned to step three, this time finding that, "[b]eginning on March 8, 2016, the severity of the claimant's impairments has met the criteria of section 12.04." *Id.* at 1009. He again did not provide a specific explanation for the choice of March 8, 2016, as a cutoff date. The ALJ generally identified treatment records which showed that beginning around this time, Plaintiff "exhibited evidence of anger and irritability that affects his ability to interact with others," "had difficulty in crowds, social situations, and around loud noise, which resulted in [Plaintiff] isolating

himself," and "experienced panic attacks, despite adhering to his prescribed medication regimen." *Id.* He explicitly discussed some medical opinion evidence (including an April 2019 opinion by Dr. Coll-Ruiz), but again not the September 2016 Dr. Coll-Ruiz opinion he was directed to consider on remand. *See id.* at 1009–10. Ultimately, the ALJ found Plaintiff was disabled beginning on March 8, 2016. *Id.* at 1011.

### D.  The ALJ's Third Decision on Remand from Appeals Council

Plaintiff appealed this second ALJ decision to the appeals council, which affirmed that Plaintiff was disabled as of March 8, 2016, but remanded the case back for further proceedings on whether he was also disabled prior to that date. *Id.* at 1024–26. The remand order stated that the ALJ did not comply with the council's prior order to consider Dr. Coll-Ruiz's September 2016 opinion, and that "consideration of this opinion is needed" because it "is relevant to the unfavorable portion of the decision." *Id.* at 1024–25. Further, the ALJ "did not provide adequate rationale in rejecting the opinions of the claimant's treating sources," such as treating psychiatrist Dr. Coll-Ruiz. *Id.* at 1025. In this vein, the April 2019 opinion by Dr. Coll-Ruiz, which the ALJ did consider, had stated that Plaintiff would have had "marketed mental limitations . . . since January 2012." *Id.* The ALJ did not explain why, then, he had only credited this opinion beginning on March 8, 2016, and not earlier. *Id.*

A fourth hearing took place on October 22, 2021, in front of a different ALJ, ALJ John T. Molleur. *See id.* at 951–69. That ALJ's subsequent decision, and its adoption by the Commissioner, is the one at issue in the present motions.

On February 7, 2022, ALJ Molleur affirmed ALJ Suna's decision that Plaintiff was not disabled prior to March 8, 2016. *Id.* at 855. The analysis of steps one through three remained largely the same. *Id.* at 843. This time, at step four, ALJ Molleur diverged somewhat from ALJ

Suna, in both his RFC determination and supporting analysis.  ALJ Molleur found at step four that Plaintiff had the RFC "to perform *medium work*," as opposed to light work, and "could withstand no more than occasional decision making or changes in the work setting," "tolerate brief, incidental contact with the general public," and "could not engage in tandem or other team-oriented work." *Id.* at 845 (emphasis added).

ALJ Molleur also went into greater detail about the supporting medical and non-medical evidence.  In relevant part, the ALJ noted that "[a]t the hearing, the [Plaintiff] testified that he could not recall clearly the period at issue," testified "he cried all the time when he was living with his niece," "his medications helped 'more or less," and "he currently did not feel as bad as he used to."  *Id.*  Turning to the treatment records, he noted how Plaintiff was seen briefly in October and November of 2011 for his depression and bereavement, but "his mini mental status examinations were essentially normal."  *Id.* at 846.  He also identified how Plaintiff saw Dr. Iyer in September 2012 after a period of heavy drug use, but that the treatment record describes how Plaintiff was stabilizing as of that date.  *Id.*  After care was reestablished with Dr. Coll-Ruiz in November 2013, treatment records show that Plaintiff's mood was improving consistently, until January 2016, when he began to experience an increase in symptoms and drastically cut back on taking his medications. *See id.* 846–48.  The ALJ noted how on March 8, 2016, Plaintiff "reported that he hears 'someone calling his name at night.'"  *Id.* at 848.  But for the most part, the ALJ also describes treatment records from January to March 2016 as "essentially normal."  *Id.*

Finally, the ALJ discussed each of the medical opinions he considered on Plaintiff's mental impairments and assigned each persuasive weight:  he gave "some weight" to state consultative examiner Dr. Nobel's April 2014 opinion finding Plaintiff's mental symptoms "non-severe," *id.* at 849; "partial weight" to Dr. Mahony's January 2012 opinion stating that Plaintiff had "several

symptoms of depression" but was otherwise able to take care of himself and "appropriately deal with stress," *id.*; "minimal partial weight" to Dr. Mahony's February 2016 opinion that he had "various symptoms of depression," *id.* at 850; and "very little to no weight" to independent medical examiner Dr. Robins' August 2019 opinion that was largely based on Plaintiff's own self-reports, *id.* at 853.

The ALJ also gave "minimal weight" to Dr. Coll-Ruiz's September 2016 opinion stating that Plaintiff "was modestly to markedly impaired in all areas of functioning expect for being punctual and adhering to basic standards of neatness" all the way back to August of 2011, *id.* at 852; and "minimal weight" to Dr. Coll-Ruiz's similar April 2019 opinion, *id*.  In particular, the ALJ found that Plaintiff's main complaints to Dr. Coll-Ruiz pertained to depression as a result of bereavement and "revolved around his difficulties getting along with his roommates."  *Id.*  The ALJ concluded that "[t]he degree of limitation opined to by Dr. Coll-Ruiz [in both September of 2016 and April of 2019] is not supported by the evidence of record" and was "in the manner of a concerned advocate rather than an objective medical source."  *Id.*

Plaintiff sought review of ALJ Molleur's decision by the appeals council, which declined to assume jurisdiction on June 30, 2022.  Tr. 823–28.  Plaintiff then timely filed suit in the District of Connecticut, where he now lives.  Compl., ECF No. 1 ¶ 2.  Plaintiff has moved for judgment on the pleadings, ECF No. 13, and Defendant has cross-moved to affirm the Commissioner's decision, ECF No. 17.

## II.    LEGAL STANDARD

### A.  Standard of Review

It is well-settled that a district court will reverse the decision of the Commissioner as to whether a claimant is disabled only when it is based upon legal error or when it is not supported

by substantial evidence in the record.  *See e.g.*, *Greek v. Colvin*, 802 F.3d 370, 374–75 (2d Cir. 2015) (per curiam); 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . .").  "Substantial evidence is more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012) (internal quotation marks and citation omitted).

"In determining whether the agency's findings were supported by substantial evidence, the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn." *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (per curiam) (quotation marks and citation omitted).  Under this standard of review, "absent an error of law, a court must uphold the Commissioner's decision if it is supported by substantial evidence, even if the court might have ruled differently." *Campbell v. Astrue*, 596 F. Supp. 2d 446, 448 (D. Conn. 2009).  The court must therefore "defer to the Commissioner's resolution of conflicting evidence," *Cage v. Comm'r of Soc. Sec.*, 692 F.3d 118, 122 (2d Cir. 2012), and reject the Commissioner's findings of fact only "if a reasonable factfinder would *have to conclude otherwise*," *Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012) (internal citation omitted) (emphasis in original).  Stated simply, "[i]f there is substantial evidence to support the [Commissioner's] determination, it must be upheld." *Selian*, 708 F.3d at 417.

B.  The Five-Step Framework for Determining "Disability"

Pursuant to regulations promulgated by the Commissioner, a five-step[5] sequential evaluation process is used to determine whether a claimant's condition meets the Social

---

[5] With respect to SSDI benefits, a claimant must also meet insured status requirements set forth in the Social Security Act.  42 U.S.C. §§ 423(a)(1)(A), 423(c)(1).  The parties do not dispute that Plaintiff meets these requirements.

Security Act's definition of "disability." *See* 20 C.F.R. § 416.920.  The five steps are best summarized as:  (1) the Commissioner determines whether the claimant is currently engaged in substantial gainful activity; (2) if not, the Commissioner determines whether the claimant has 'a severe medically determinable physical or mental impairment that meets the duration requirement in § 416.909 or a combination of impairments that is severe and meets the duration requirements; (3) if such a severe impairment is identified, the Commissioner next determines whether the medical evidence establishes that the claimant's impairment 'meets or equals' an impairment listed in Appendix 1 of the regulations; (4) if the claimant does not establish the 'meets or equals' requirement, the Commissioner must then determine the claimant's residual functional capacity ("RFC") to perform her past relevant work; and (5) if the claimant is unable to perform her past work, the Commissioner must next determine whether there is other work in the national economy which the claimant can perform in light of her RFC and her education, age, and work experience. *See Meade v. Kijakazi*, No. 3:20-CV-00868 (KAD), 2021 WL 4810604, at *1 (D. Conn. Oct. 15, 2021); *see also* 20 C.F.R. §§ 416.920(a)(4)(i)–(v), 416.909.

The claimant bears the burden of proof with respect to steps one through four, though at step five "the burden shift[s] to the Commissioner to show there is other work that [the claimant] can perform." *Brault*, 683 F.3d at 445; *Cage*, 692 F.3d at 123.  Once the ALJ identifies the jobs consistent with Plaintiff's RFC, either through the testimony of a vocational expert or the Medical Vocational Guidelines, the ALJ must determine whether these jobs exist in significant numbers in the national economy, the region where a claimant lives, or several other regions of the country. 20 C.F.R. § 416.966(a); *McIntyre v. Colvin*, 758 F.3d 146, 150 (2d Cir. 2014) (stating the ALJ must show "there are significant numbers of jobs in the national economy that the claimant can perform").

## III.    DISCUSSION

Plaintiff raises two main arguments against ALJ Molleur's RFC determination at step four. First, he contends that the ALJ failed to properly weigh the medical opinion evidence.  Specifically, he argues the ALJ should have given treating psychiatrist Dr. Coll-Ruiz's opinions (that Plaintiff was modestly or markedly impaired in nearly all areas of mental functioning as far back as the alleged onset date) controlling weight, or at least deferred to his opinions more after applying the factors set forth in *Burgess v. Astrue*, 537 F.3d 117 (2d Cir. 2008) (the "treating physician rule"). Second, Plaintiff claims the ALJ erred at the second step of the two-step framework for evaluating Plaintiff's subjective statements of disability, when he found that "Plaintiff's statements concerning the intensity, persistence, and limiting effects of his symptoms [were] 'not entirely consistent with the medical evidence and other evidence in the record.'"  ECF No. 14 at 9–10 (quoting Tr. at 845).

The Court finds the ALJ did not err in his evaluation of the medical opinion evidence, nor in his evaluation of Plaintiff's subjective statements of disability.  The ALJ properly gave Dr. Coll-Ruiz's September 2016 and April 2019 opinions and Plaintiff's belated testimony little weight, because they were inconsistent with the actual treatment records from late 2011 to March of 2016, and the contemporaneous medical opinions generally showing stability.  The decision of the Commissioner is therefore affirmed.

### A.    The ALJ's Evaluation of the Medical Opinion Evidence

The Court first finds that the ALJ properly applied the treating physician rule when evaluating the medical opinion evidence.[6]  Under the rule, ALJs must give a treating physician's

---

[6] The 2017 Revision to Rules Regarding the Evaluation of Medical Evidence "effectively abolished" the rule that the medical opinion of a treating physician was entitled to deference for claims filed after March 27, 2017.  *Davila v. Comm'r of Soc. Sec.*, No. 17cv6013 (JGK), 2019 WL 1244661, at *5 n.6 (S.D.N.Y. Mar. 18, 2019).  But Plaintiff filed his claim for benefits on February 27, 2014, so the treating physician rule applies here.  ECF No. 1 ¶ 6.

opinion about an impairment "'controlling weight' so long as it 'is well-supported by medically acceptable clinical and laboratory diagnostic testing and is not inconsistent with the other substantial evidence in [the] case record.'" *Burgess*, 537 F.3d at 128 (quoting 20 C.F.R. § 404.1527(d)(2)). If the ALJ were to find that the treating physician's opinion is not entitled to controlling weight, the ALJ must "explicitly consider the following, nonexclusive *Burgess* factors" before assigning persuasive weight: "(1) the frequen[cy], length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is a specialist." *Estrella v. Berryhill*, 925 F.3d 90, 95–96 (2d Cir. 2019) (internal quotation marks and citation omitted). Failure to do so is a "procedural error;" but if "'a searching review of the record' assures us 'that the substance of the treating physician rule was not traversed,'" the decision will be affirmed. *Id.* at 96 (quoting, in part, *Halloran v. Barnhart*, 362 F.3d 28, 33 (2d Cir. 2004)).

Here, there is substantial evidence supporting the ALJ's finding that Dr. Coll-Ruiz's opinions were "wholly inconsistent with the [treatment records]," Tr. at 852, and therefore not entitled to controlling weight under *Burgess*. Dr. Coll-Ruiz submitted two mental health opinions, a September 2016 and April 2019 opinion. *Id.* at 2326–30 (September 2016 opinion)[7]; *id.* at 2049–53 (April 2019 Opinion). In the first, Dr. Coll-Ruiz generally described Plaintiff's symptoms as "low mood, irritability, lack of energy, depression, [and] low frustration tolerance," before concluding that Plaintiff was modestly to markedly impaired in all twenty-three areas of mental functioning except his "ability to perform activities within a schedule and consistently be punctual" as far back as August 19, 2011. *Id.* at 2328–30. In the second, Dr. Coll-Ruiz concluded Plaintiff

---

[7] The Court notes that the first page of this opinion states the doctor's name is "Kim Maldonado," Tr. at 2326, but the last page is signed by Dr. Coll-Ruiz, *id.* at 2330. Neither party disputes this is Dr. Coll-Ruiz's opinion, though it appears it may have been completed with the help of Kim Maldonado.

was modestly to markedly impaired in *all* twenty-three criteria dating back to January 19, 2012. *Id.* at 2052.

But as the ALJ thoroughly outlined in his opinion, Plaintiff's treatment records from the period between January 19, 2012, and March 8, 2016 (the timeframe at issue) show his symptoms were not so severe as Dr. Coll-Ruiz opined. To start, it is intuitive that opinions from September 2016 and April 2019, commenting on Plaintiff's capacity as far back as August of 2011, risk being inconsistent with medical evidence from that period. Indeed, a January 2012 opinion by Dr. Mahony states that Plaintiff was "appropriately deal[ing] with stress." *Id.* at 849. Notes from December 2013 show that after being diagnosed with major depression and opioid dependence he was "having good and bad days" and "utiliz[ing] coping skills." *Id.* at 215; *see also id.* at 847 (discussing these records). Similarly, in February 2014, records show Plaintiff was "managing depressive symptoms" and "keeping busy." *Id.* at 211; *see also id.* at 847 (discussing these records). Similar reports continued through the rest of 2014 and 2015. *See*, *e.g.*, *id.* at 189 (describing how Plaintiff "[e]xpressed frustration regarding current living arrangements" such as how "roommate expects him to cook daily" in December 2014); *id.* at 173 (describing how Plaintiff was able to "process feelings" of his father's recent death in May 2015); *id.* at 152 (stating Plaintiff is "cooperative and engaged" and "stable" in September 2015); *see also* Tr. at 848 (summarizing reports). This accords with Dr. Mahony's February 2016 opinion that he was showing various symptoms of depression, but still was otherwise able to engage in normal daily activities. *Id.* at 850. ALJ Suna appeared to have chosen March 8, 2016, as the date for the start of the disability period because that is the date the treatment notes first reported that Plaintiff heard voices calling his name at night. *Id.* at 1648. The Court agrees with ALJ Molleur's assessment that Dr. Coll-Ruiz' opinions appear more akin to that of a "concerned advocate" than an "objective medical

14

source," *id.* at 852, insofar as the limitations Dr. Coll-Ruiz assessed do not appear to match the medical records documenting that Plaintiff's depression appeared largely controlled with medication, save for instances when it became exacerbated during bereavement. In sum, given the amount of inconsistent medical evidence from this period, the ALJ need not have given Dr. Coll-Ruiz's opinions, stating Plaintiff would be moderately to markedly impaired in the workplace as far back as January 19, 2012, controlling weight.

Because the Dr. Coll-Ruiz opinions were not given controlling weight, the Court next turns to whether the ALJ properly articulated the *Burgess* factors before assigning both opinions minimal weight. Here, the ALJ did "explicitly consider" all four *Burgess* factors—"(1) the frequen[cy], length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is a specialist," *Estrella*, 925 F.3d at 95–96 (internal quotation marks and citations omitted)—except arguably the fourth. In clear satisfaction of the first, the ALJ noted that Dr. Coll-Ruiz first treated Plaintiff in August 2011, but did not begin steady treatment until November 2013, after which he saw Plaintiff approximately every two months for medication management. Tr. at 852. As for the second, the ALJ examined the medical evidence supporting the opinions; even accepting Plaintiff's argument that Dr. Robins' and Dr. Mahony's opinions supported Dr. Coll-Ruiz, the ALJ considered them and articulated why he did not find them persuasive. *Id.* at 850, 853. Next, the ALJ was explicit with regards to the third factor, stating Dr. Coll-Ruiz's opinions were almost "wholly inconsistent with the [treatment records] indicating that the [Plaintiff] mostly complained about his family and his inability to afford his o[w]n apartment and his quest to get public assistance." *Id.* at 852. Last, while the ALJ did not explicitly discuss Dr. Coll-Ruiz's specialty in psychiatry, the ALJ clearly understood throughout his opinion that Dr.

Coll-Ruiz, the Plaintiff's treating provider for depression and bereavement, is a psychiatrist who was opining about his mental health symptoms. *See Loria A. K. v. Comm'r of Soc. Sec.*, No. 3:22-CV-00118-TOF, 2023 WL 2607637, at *6 (D. Conn. Mar. 23, 2023) (recognizing that ALJ "clearly understood" the specialty of the treating physician). In sum, because the ALJ considered Dr. Coll-Ruiz's status as a treating psychiatrist alongside the inconsistent treatment records, it is clear "the substance of the treating physician rule was not traversed" when he only gave his opinions minimal weight. *Halloran*, 362 F.3d at 33.

Plaintiff also claims the ALJ "erred by not citing to any *specific* medical facts nor persuasive non-medical evidence that supports the mental RFC found for [Plaintiff]," and therefore improperly evaluated the medical evidence by substituting his judgment for that of a doctor. *See* ECF No. 14 at 8 (emphasis in original). But for the reasons described above, namely the treatment records showing relative stability, this is not a situation where "no medical evidence support[s] the ALJ's RFC determination." *Joseph v. Comm'r of Soc. Sec.*, No. 18-CV-838 (AMD), 2019 1993992, at *2 (E.D.N.Y. May 6, 2019) (remanding where "ALJ disregarded the only expert medical opinion"). More fundamentally, the Second Circuit has explicitly "reject[ed]" the argument that an "ALJ commit[s] reversible error by basing [his] RFC determination on [his] own lay opinion rather than on record medical evidence." *Curry v. Comm'r of Soc. Sec.*, 855 F. App'x 46, 48 n.3 (2d Cir. 2021) (summary order). To the contrary, "the Commissioner's regulations make clear" that an "[RFC] determination is within the province of the ALJ." *Id.* Thus, the ALJ did not err in this regard either.

B.  The ALJ's Evaluation of Plaintiff's Subjective Statements

The Court next finds that the ALJ did not err at step two of the two-step framework for evaluating a plaintiff's subjective statements regarding her disability, when he found that

"Plaintiff's statements concerning the intensity, persistence, and limiting effects of his symptoms [were] 'not entirely consistent with the medical evidence and other evidence in the record.'" ECF No. 14 at 9–10 (quoting Tr. at 845).

As background, the ALJ must decide at step one "whether the claimant suffers from a medically determinable impairment that could reasonably be expected to produce the symptoms alleged," which is not contested here. *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (citing 20 C.F.R. § 404.1529(b)). At step two, the ALJ makes a credibility determination. Specifically, "the ALJ must consider 'the extent to which [the claimant's] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence' of record." *Id.* (quoting 20 C.F.R. § 404.1529(a)) (brackets in original). There are seven factors the ALJ "must consider": '[s]tatements [the claimant] or others make about [his] impairment(s), [his] restrictions, [his] daily activities, [his] efforts to work, or any other relevant statements [he] make[s] to medical sources during the course of examination or treatment, or to [the agency] during interviews, on applications, in letters, and in testimony in [its] administrative proceedings." *Id.* (quoting 20 C.F.R. § 404.1512(b)(3) (brackets in original). But "if the ALJ thoroughly explain[s] his credibility determination and the record evidence permits us to glean the rationale of the ALJ's decision," the ALJ need not "discuss all seven factors" and the decision will be affirmed. *Cichocki v. Astrue*, 534 F. App'x 71, 76 (2d Cir. 2013) (summary order).

Here, although he did not cite all seven factors, the ALJ explained at step two that he did not find the Plaintiff's subjective statements of disability credible because they "[we]re not entirely consistent with the medical evidence and other evidence in the record." Tr. at 845. To start, the ALJ discussed how Plaintiff acknowledged that "he could not recall clearly the period at issue." *Id.*; *see also id.* at 953–54 (answering "I don't remember that" when asked "[w]ere you seeing

anybody for these symptoms related to mental illness as far back as 2012?").  The ALJ also noted

that Plaintiff "testified that he currently did not feel as bad as he used to" and "cried all the time

when he was living with his niece," lending credence to the idea that Plaintiff's housing

circumstances were a source of his frustration.  *Id.* at 845.  While this may be true, the ALJ

continued on to explain that the treatment records from January 2012 to March 2016 show that

Plaintiff's mental health was relatively stable; at least, they were not as severe as suggested in Dr.

Coll-Ruiz's opinions.  The ALJ walked through several of these records in chronological order.

*See id.* at 846–48.  He made specific note of some of the daily activities these medical records

stated Plaintiff was engaging in: watching television, sketching, pursuing a new romantic

relationship, and applying for various financial assistance programs.  *Id.* at 847; *see also Johnson*

*v. Berryhill*, No. 3:16-cv-01050 (SRU), 2017 WL 2381272, at *8 (D. Conn. June 1, 2017)

(upholding an ALJ's adverse credibility determination when a claimant's testimony was

inconsistent with other evidence related to his daily activities).

Without citing any law in support, Plaintiff argues it was improper for the ALJ to "reference

to evidence of [Plaintiff's] supposed non-compliance [with medication]" in "support of the finding

that [Plaintiff's] allegations are not credible."  ECF No. 14 at 10.  The ALJ, however, appropriately

considered that Plaintiff stopped taking prescribed medication, apparently in favor of receiving

medications "from a friend."  Tr. at 847.  Moreover, even if the ALJ's failure to mention the reason

for Plaintiff's non-compliance with medication were incorrect, it is clear from his opinion that his

adverse credibility determination rested not merely on non-compliance with medication, but on

the inconsistency between the Plaintiff's testimony and the other medical evidence about his mood.

Indeed, "[o]ne strong indication of credibility of an individual's statements is their consistency,

both internally and with other information in the record."  *Morris v. Comm'r of Soc. Sec.*, No. 5:12-CV-1795 MAD/CFH, 2014 WL 1451996, at *6 (N.D.N.Y. Apr. 14, 2014).

In short, the ALJ adequately explained that he found Plaintiff not credible because he was testifying at a high level of generality, many years after the fact, and his testimony was inconsistent with contemporaneous treatment records about his mood and daily activities.  The Court will not upset this credibility determination.  "It is the role of the Commissioner, not the reviewing court, to 'resolve evidentiary conflicts and to appraise the credibility of witnesses,' including with respect to the severity of a claimant's symptoms."  *Cichocki*, 534 F. App'x at 75 (quoting *Carroll v. Sec'y of Health & Human Servs.*, 705 F.2d 638, 642 (2d Cir. 1983)).  The ALJ therefore did not err in his evaluation of Plaintiff's subjective statements of disability, either.

## IV.     CONCLUSION

Plaintiff's motion for judgment on the pleadings is DENIED, and Defendant's motion to affirm the Commissioner's decision is GRANTED.  The Clerk of Court is directed to close the case.

**SO ORDERED** at Hartford, Connecticut, this 25th day of September, 2023.


  */s/ Sarala V. Nagala*
SARALA V. NAGALA
UNITED STATES DISTRICT JUDGE